## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

OFFICE OF THE ATTORNEY GENERAL FOR THE
STATE OF NEW MEXICO,
FIRST JUDICIAL DISTRICT ATTORNEY'S OFFICE,
LAW OFFICES OF THE PUBLIC DEFENDER,
NEW MEXICO FAITH COALITION FOR IMMIGRANT JUSTICE,
ENLACE COMUNITARIO, and
EL CENTRO DE IGUALDAD Y DERECHOS,

       Plaintiffs,

vs.                                Civil Action No. _____

U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT,
MATTHEW T. ALBENCE, in his official capacity as
Acting Deputy Director of U.S. Immigration and
Customs Enforcement and Senior Official
Performing the Duties of the Director,
COREY PRICE, in his official capacity as
Director of the El Paso Immigration and Customs
Enforcement Field Office,
U.S. DEPARTMENT OF HOMELAND SECURITY, and
CHAD WOLF, in his official capacity as
Acting Secretary of United States Department of
Homeland Security,

       Defendants.

## COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

### INTRODUCTION

The United States Supreme Court and the New Mexico Supreme Court have long recognized a privilege against civil arrests for those attending court on official business—a privilege that traces its roots back to English common law, and rests on the common sense principle that the judicial system cannot function if parties and witnesses fear that their appearance in court will be used as a trap.

Since 2017, officers from U.S. Immigration and Customs Enforcement ("ICE") have increasingly utilized New Mexico state courthouses—including courtrooms, hallways, parking lots, bathrooms and front steps—as venues to arrest those they believe have violated federal *civil*, not criminal, law.

On January 10, 2018, ICE formalized its courthouse arrest policy through Directive No. 11072.1, entitled "Civil Immigration Actions Inside Courthouses" ("Courthouse Arrest Policy"). The Courthouse Arrest Policy "sets forth [ICE's] policy regarding civil immigration enforcement inside federal, state, and local courthouses." As a result of this policy, many undocumented New Mexican residents will not attend New Mexico state courts as parties or witnesses to criminal and civil matters for fear of being arrested by ICE.

Plaintiffs represent a range of actors in the state court system—criminal prosecutors, criminal defense attorneys, civil litigants, and community organizations—all of whom have directly felt the impact of ICE's policy of civilly arresting people in and around New Mexico state courthouses. Through this case, the Office of the Attorney General for the State of New Mexico, New Mexico's First Judicial District Attorney's Office, the New Mexico Law Office of the Public Defender ("LOPD"), and three local organizations challenge the federal government's policy of civilly arresting individuals in and around New Mexico state courthouses because it undermines the fair administration of justice in New Mexico.

For these reasons, and as set forth below, Plaintiffs ask this Court:  (1) to enter an Order vacating and setting aside ICE's Civil Courthouse Arrest Policy as unlawful; and (2) to enjoin Defendants and all of their officers, employees, agents, and anyone acting in concert with them, from implementing, applying, or taking any action whatsoever under the Civil Courthouse Arrest

Policy to arrest any parties, witnesses, or others while they are going to, attending, or leaving New Mexico courthouses on official business.

## JURISDICTION AND VENUE

1.      The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1346. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, *et seq*. The United States has waived its sovereign immunity pursuant to 5 U.S.C. § 702.

2.      Venue properly lies within the District of New Mexico because this is an action against an officer, employee, and/or agency of the United States, all Plaintiffs reside in this judicial district, and a substantial part of the events or omissions giving rise to this action have occurred in this judicial district. *See* 28 U.S.C. § 1391(e)(1).

## PARTIES

3.      Plaintiff Office of the Attorney General for the State of New Mexico brings this suit in its official capacity as the prosecutor for the State of New Mexico in all civil and criminal causes of action in which the State of New Mexico is a named or interested party.

4.      As one of the seven independently elected statewide offices in New Mexico, Plaintiff Office of the Attorney General for the State of New Mexico represents and defends the legal interests and sovereignty of the people of the State of New Mexico.

5.      Plaintiff Office of the Attorney General for the State of New Mexico exercises the responsibilities delegated by the New Mexico Constitution, statutes enacted by the New Mexico Legislature, and the common law.

6.      Plaintiff Office of the Attorney General for the State of New Mexico is charged with the following duties relevant to this action:

a.  Appearing before local, state and federal courts and regulatory offices, agencies, and bodies, to represent and to be heard on behalf of the State of New Mexico when, in the Attorney General's judgment, the public interest of the State of New Mexico requires such action.

b.  Prosecuting and defending all civil and criminal cases brought before New Mexico state courts, including the New Mexico Supreme Court and Court of Appeals, in which the State of New Mexico is a named or interested party;

c.  Prosecuting and defending in any court or tribunal all actions and proceedings, civil or criminal, in which the State of New Mexico may be a named or interested party when, in the Attorney General's judgment, the interest of the State of New Mexico requires such action.

7.  Plaintiff Office of the Attorney General for the State of New Mexico also works concurrently with New Mexico's thirteen (13) district attorneys and other local, state, and federal law enforcement authorities to carry out its criminal justice responsibilities and activities.

8.  Plaintiff Office of the Attorney General for the State of New Mexico is headquartered in three offices across New Mexico: (1) Santa Fe Office, 408 Galisteo Street Villagra Building, Santa Fe, New Mexico 87501; (2) Albuquerque Office, 201 3rd St. NW, Suite 300, Albuquerque, New Mexico 87102; and (3) Las Cruces Office, 201 N. Church St., Suite 315, Las Cruces, New Mexico 88001.

9.  Plaintiff First Judicial District Attorney's Office brings this suit in its official capacity as a prosecutor for the State of New Mexico.

10.  The First Judicial District Attorney's Office is charged with the duties of initiating and conducting prosecution of criminal offenses and enforcing state laws in the Santa Fe, Rio

Arriba, and Los Alamos Counties in the State of New Mexico pursuant to Article VI, Section 24 of the New Mexico Constitution.

11.　　The First Judicial District Attorney's Office is headquartered in three county offices: (1) Santa Fe County Office, 327 Sandoval Street, Santa Fe, New Mexico 87501; (2) Rio Arriba County Office, 1122 Industrial Park Road, Española, New Mexico 87532; and (3) Los Alamos County Office, 2500 Trinity Drive, Suite D, Los Alamos, New Mexico 87544.

12.　　Plaintiff LOPD is responsible for indigent criminal defense throughout the State of New Mexico on misdemeanor, juvenile, and felony cases, through appeal and post-conviction proceedings, if necessary.

13.　　In 1973, the New Mexico Legislature enacted the New Mexico Public Defender Act, NMSA 1978, §§ 31-15-1 to -12 (1973, as amended through 2014), to meet the State of New Mexico's Constitutional obligations to provide counsel to indigent persons charged with crimes in New Mexico state courts.

14.　　In 2012, the citizens of the State of New Mexico voted to make Plaintiff LOPD a constitutionally created state entity under Article VI, § 39 of the New Mexico State Constitution.

15.　　Plaintiff LOPD is headquartered at 301 N. Guadalupe Street, Santa Fe, New Mexico 87501, and has offices throughout New Mexico in the cities of Aztec, Gallup, Taos, Santa Fe, Albuquerque, Clovis, Portales, Hobbs, Carlsbad, Roswell, Alamogordo, and Las Cruces.

16.　　Plaintiff LOPD provides legal counsel to indigent persons charged with crimes in over 70,000 cases each year.

17.　　Undersigned counsel has obtained a Special Commission and express permission from the Office of the Attorney General for the State of New Mexico to institute this action on behalf of Plaintiffs First Judicial District Attorney's Office and LOPD.

18.     Plaintiff New Mexico Faith Coalition for Immigrant Justice ("Plaintiff Faith Coalition") is a 501(c)(3) non-profit organization that was founded in 2009 and is headquartered in Albuquerque, New Mexico.

19.     Plaintiff Faith Coalition's mission is to collaborate with faith communities to create an ecumenical and inter-faith alliance in the State of New Mexico for immigrant justice through a variety of community services to residents of Bernalillo, Cibola, and Valencia Counties in the State of New Mexico.

20.     Plaintiff Enlace Comunitario is a 501(c)(3) non-profit organization that was founded in 2000 and is headquartered in Albuquerque, New Mexico.

21.     Plaintiff Enlace Comunitario's mission is to transform the lives of Latino immigrants and their families experiencing domestic violence by working to decrease gender inequality and intimate partner violence through direct legal services, leadership development, preventative community education, outreach and policy advocacy in collaboration with community partners.

22.     Plaintiff Enlace Comunitario provides direct services to over 700 families a year through direct community services, including representing its clients through legal proceedings in obtaining Domestic Violence Orders of Protection, as well as direct legal representation through the litigation process for domestic matters cases, including divorce, custody, parentage and child support cases.

23.     Plaintiff EL CENTRO de Igualdad y Derechos ("Plaintiff EL CENTRO") is a Latino immigrant-led, membership non-profit organization headquartered in Albuquerque, New Mexico with over 5,000 members, the majority of whom are low-wage workers.

6

24.     Plaintiff EL CENTRO works with Latino immigrant communities to defend, strengthen, and advance the rights of immigrants.

25.     Defendant ICE is a federal agency charged with enforcement of federal immigration laws, including execution of the Civil Courthouse Arrest Policy, dated January 10, 2018.

26.     Defendant Matthew T. Albence is the Deputy Director and Senior Official Performing the Duties of the Director of ICE.

27.     On information and belief, Defendant Albence is responsible for executing ICE's Civil Courthouse Arrest Policy.

28.     Defendant Albence is sued in his official capacity.

29.     Defendant Corey Price is the Acting El Paso Field Office Director of ICE Enforcement and Removal Operations.

30.     Defendant Price is charged with ICE enforcement in the west Texas area and the entire State of New Mexico.

31.     Defendant Price is sued in his official capacity.

32.     Defendant the Department of Homeland Security ("DHS") is a Cabinet department of the U.S. federal government, which oversees Defendant ICE.

33.     Defendant Chad Wolf is the Acting Secretary of Defendant DHS.

34.     Defendant Chad Wolf is responsible for executing relevant provisions of the Executive Order 13,768, entitled "Enhancing Public Safety in the Interior of the United States" (the "Executive Order 13,768" or "Executive Order"), issued on January 25, 2017.

35.     Defendant Chad Wolf is sued in his official capacity.

## STATEMENT OF FACTS

**I.     The Common Law Privilege Against Civil Arrest**

36.     The common-law privilege against civil arrest while attending court on official business is longstanding, tracing its origins back at least to the English courts in the eighteenth century.

37.     Blackstone's Commentaries on the Laws of England explained the common-law privilege as follows: that "Suitors, witnesses, and other persons, necessarily attending any courts of record upon business, are not to be arrested during their actual attendance, which includes their necessary coming and returning. And no arrest can be made in the king's presence, nor within the verge of his royal palace, nor in any place where the king's justices are actually sitting." 3 William Blackstone, Commentaries of the Laws of England 289 (1979).

38.     Over a century ago, the United States Supreme Court adopted this historical common law privilege by barring service of any other civil process while attending court. *See, e.g.*, *Stewart v. Ramsay*, 242 U.S. 128, 129-30 (1916); *Page Co. v. McDonald*, 261 U.S. 446, 448 (1928); *Lamb v. Schmitt*, 285 U.S. 222, 225 (1932); *Long v. Ansell*, 293 U.S. 76, 83 (1934).

39.     The Tenth Circuit later also formally recognized this common law privilege and general rule. *See Walker v. Calada Materials Co.*, 309 F.2d 74, 76 (10th Cir. 1962).

40.     The privilege against civil courthouse arrests is also firmly rooted in New Mexico constitutional and statutory law.

41.     For example, in 1937, the New Mexico State Legislature enacted what is now titled the New Mexico Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings ("Uniform Act to Secure the Attendance of Witnesses," NMSA 1978, §§ 31-8-1 to -6 (1937, as amended through Laws of 1953)). Included in the New Mexico Uniform

8

Act to Secure the Attendance of Witnesses is Section 31-8-4, which is entitled "**Exemption from arrest and service of process**":

> If a person comes into this state in obedience to a summons directing him to attend and testify in this state *he shall not while in this state pursuant to such summons be subject to arrest or the service of process*, civil or criminal, in connection with matters which arose before his entrance into this state under the summons.
>
> If a person passes through this state while going to another state in obedience to a summons to attend and testify in that state or while returning therefrom, *he shall not while so passing through this state be subject to arrest or the service of process, civil or criminal*, in connection with matters which arose before his entrance into this state under the summons.

NMSA 1978, § 31-8-4 (1937, as amended through Laws of 1953) (emphasis added). New Mexico's adoption of the Uniform Act to Secure the Attendance of Witnesses did not supplant the common law, but was enacted in furtherance of the common law.

42.     The privilege protecting witnesses is also rooted in New Mexico common law. *See State v. Kayser*, 1919-NMSC-019, ¶ 14, 25 N.M. 245, 181 P. 278; *State v. Cooper*, 1958-NMSC-035, ¶¶ 4-7, 64 N.M. 18, 322 P.2d 713.

43.     ICE's practice of civilly arresting individuals in and around New Mexico courthouses violates and unduly infringes upon New Mexico common law and statutory law as well as United States Supreme Court precedent.

## II.     ICE's Courthouse Arrest Policy

### A.     Executive Order 13,768

44.     Shortly after taking office, on January 25, 2017, President Trump issued "Executive Order 13,768: Enhancing Public Safety in the Interior of the United States."

45.     Through Executive Order 13,768, President Trump abandoned past deportation prioritization programs embraced by both the Bush and Obama Administrations and called for the

deportation of anyone potentially removable from the United States—likely more than 11 million people.

46.     The stated policy of Executive Order 13,768 was to "[m]ake use of all available systems and resources to ensure the efficient and faithful execution of the immigration laws of the United States." Executive Order 13,768(2)(b).

47.     One way ICE has attempted to use "all available systems and resources" to implement Executive Order 13,768 is to use state court appearances by civil and criminal parties, witnesses, and non-parties as an opportune time and place to execute a civil immigration arrest.

48.     After the Trump Administration issued Executive Order 13,768, ICE officials began increasingly conducting courthouse surveillance and arrests at state courthouses.

49.     Since then, state courthouse arrests and surveillance operations have continued to expand in geographic scope and severity.

50.     ICE officials have repeatedly defended the practice of civil courthouse arrests.

51.     Defendant DHS acknowledges the practice and condones its continued use as a way of using the state's resources for federal benefits.

52.     DHS and ICE have also made clear that *anyone* is subject to an ICE civil arrest while attending court, *including victims*.

53.     In public remarks throughout 2017, DHS and other Trump Administration officials continued to clarify their intent to arrest victims and witnesses, including an ICE spokeswoman's statement: "If [a courthouse is] the only place we can find them, why wouldn't we? . . . We will continue to make those arrests."

54.     ICE Policy No. 10029.2 recognizes the following "Sensitive Locations" where immigration actions (i.e., arrests, interviews, searches, and surveillance) shall neither occur nor focus on unless exigent circumstances exist:

     a.    Schools (including pre-schools, primary schools, secondary schools, post-secondary schools up to and including colleges and universities, and other institutions of learning such as vocational or trade schools);

     b.    Hospitals;

     c.    Churches, synagogues, mosques or other institutions of worship, such as buildings rented for the purpose of religious services;

     d.    The site of a funeral, wedding, or other public religious ceremony; and

     e.    A site during the occurrence of a public demonstration, such as a march, rally or parade.

55.     ICE Policy No. 10029.2 recognizes the preceding list of "Sensitive Locations" is not an exclusive list, and ICE officers and agents are required to consult with their supervisors if the location of a planned enforcement operation could reasonably be viewed as being at or near a sensitive location.

56.     However, ICE has refused to recognize courthouses as "Sensitive Locations" and maintains that it possesses full discretion to civilly arrest anyone in and around any courthouse.

**B.     ICE's Civil Courthouse Arrest Policy**

57.     On January 10, 2018, ICE formalized its Civil Courthouse Arrest Policy in ICE Directive No. 11072.1, entitled "Civil Immigration Actions Inside Courthouses".

58.     Instead of recognizing courthouses as "Sensitive Locations," ICE's Civil Courthouse Arrest Policy "sets forth [ICE's] policy regarding civil immigration enforcement inside federal, state, and local courthouses."

59.     The Courthouse Arrest Policy vests ICE with the unbridled discretion to make civil arrests in and around virtually *any* courthouse location when ICE deems it "necessary."

60.     The Courthouse Arrest Policy states that ICE's courthouse arrests will "include" actions against "specific, target aliens with criminal convictions, gang members, national security or public safety threats, aliens who have been ordered removed from the United States but have failed to depart, and aliens who have re-entered the country illegally after being removed."

61.     The Courthouse Arrest Policy does not *limit* its arrests to these "target aliens."

62.     The Courthouse Arrest Policy provides that "[a]liens encountered during a civil immigration enforcement action inside a courthouse" who are not "targeted alien[s] . . . will not be subject to . . . enforcement action, *absent special circumstances*."

63.     However, the Courthouse Arrest Policy provides no information concerning what ICE considers "special circumstances," and simply states that "ICE officers and agents will make enforcement determinations on a case-by-case basis in accordance with federal law and consistent with U.S. Department of Homeland Security (DHS) policy."

64.     The Courthouse Arrest Policy does not state what this DHS policy is, but instead cross-references two other internal DHS memoranda which say nothing about courthouse arrests and one of which explicitly states that DHS will "no longer will exempt classes or categories of removable aliens from potential enforcement."

65.     Ultimately, the Courthouse Arrest Policy simply formalizes Executive Order 13,768, which vested ICE with complete discretion to use state courthouses as a trap to arrest *anyone* suspected of a civil immigration violation—including criminal defendants, victims, witnesses, and parties to civil proceedings.

**III.**     **ICE officers are routinely present in New Mexico State courthouses, arresting parties, causing significant disturbances, and sending a clear signal that appearing in New Mexico State courthouses entails risking civil ICE arrest.**

66.     ICE does not disclose the frequency of, or details concerning, its civil courthouse arrests in New Mexico but it is readily apparent that ICE officers are regularly present in and around New Mexico State courthouses thus establishing a risk of exposure to civil ICE arrest simply for appearing in or around a New Mexico state courthouse.

67.     The presence of ICE officers in New Mexico State courts is sufficiently routine that those regularly practicing in state courts—including New Mexico state prosecutors, public defenders, and civil litigants—recognize ICE officers even though they are generally in plain clothes, not in uniform.

68.     By February 2017, the New Mexico Supreme Court had received various inquiries and requests from judges and other interested persons regarding the impact on New Mexico State court proceedings of federal arrests by ICE officers in and around courthouses or in conjunction with court proceedings.

69.     In response to ICE's disruptive activities, on February 22, 2017, the Chief Justice of the New Mexico Supreme Court requested New Mexico state court judges to provide the following information: (1) what specific experiences the New Mexico State court judge has had with ICE's civil arrests; (2) what communications the New Mexico State court judge may have had with ICE personnel; and (3) what, if anything, the New Mexico State court judge or court personnel may have done in response.

70.     The Chief Judge of New Mexico's First Judicial District Court responded by advising there was one instance she was aware of wherein a criminal defendant was picked up at

the courthouse in Tierra Amarilla, New Mexico, and, thereafter, when this individual did not report for a hearing, the criminal defense attorney reported the individual had been deported.

71.    The New Mexico Fifth Judicial District Court responded that attorneys from the local public defender's office asked the New Mexico Fifth Judicial District Court to exclude ICE from the courthouse and court proceedings.

72.    The Bernalillo County Metropolitan Court responded by stating there had been several arrests, some just outside the courthouse in a non-public area. One judge of the Bernalillo County Metropolitan Court indicated there had been two arrests just outside her courtroom right after a proceeding.

73.    On March 17, 2017, the Chief Justice of the New Mexico Supreme Court reported to the New Mexico Chief Judges Council about the New Mexico Supreme Court's meeting with local and regional representatives from ICE.

74.    The Chief Justice of the New Mexico Supreme Court reported that the discussion with ICE focused on ICE's intentions regarding courthouse activity generally, and two specific incidents that occurred in New Mexico courthouses.

75.    Following the meeting with ICE representatives, the Chief Justice of the New Mexico Supreme Court stated that the Court was considering what, if any, additional action should be taken.

76.    On March 27, 2017, the Deputy Director of New Mexico's Administrative Office of the Courts circulated a memorandum summary prepared by the National Center for State Courts, which summarized courthouse arrests throughout the country.

77.    In relevant part, the circulated memorandum summary reported the following information: "The president of the New Mexico Criminal Defense Lawyers Association has

written to court officials expressing concern over arrests by ICE taking place outside of courthouses in the state."

78.     As stated above, on January 10, 2018, ICE formalized Executive Order 13,768 through ICE Directive No. 10072.1.

79.     In relevant part, ICE Directive No. 10072.1 provides that "ICE officers and agents should generally avoid enforcement actions in courthouses, or areas within courthouses that are dedicated to non-criminal (e.g., family court, small claims court) proceedings."

80.     However, the plain language ICE Directive No. 10072.1 also states the following: "This policy does not apply to criminal immigration enforcement actions inside courthouses, nor does it prohibit civil immigration enforcement actions inside courthouses."

81.     Two weeks after ICE issued ICE Directive No. 10072.1, on January 31, 2018, the Eighth Judicial District Court alerted the New Mexico Supreme Court of "an unusual situation in our Raton court houses":

> The sheriff's office is within the secure court area. We have had two instances in the last month where ICE went into the sheriff's office and waited for defendants to leave the courtroom. They arrested the defendants in the court building from their vantage point in the sheriff's office.

82.     On July 20, 2018, the New Mexico State Chief Judges Council addressed ICE's arrests in and near New Mexico State courthouses.

83.     During the July 20, 2018 meeting, the New Mexico State Chief Judges Council discussed the report of the "unusual situation" that occurred in the New Mexico Eighth Judicial District Court, reports about ICE recently arresting people as they walked out of the Santa Fe Courthouse, reports about various arrests right outside the New Mexico Fourth Judicial District Court within the preceding two months, and reports about an increase in Spanish-speaking pro se

litigants appearing by telephone in the New Mexico Sixth Judicial District Court, which the Sixth

Judicial District Court attributed to a possible concern about litigants being arrested by ICE.

84.     During the July 20, 2018 meeting of the New Mexico State Chief Judges Council,

the Deputy Director of New Mexico's Administrative Office of the Courts, summarized the reports

about ICE's recent arrests as follows:

> The New Mexico Supreme Court (NMSC) asked courts throughout the state to report ICE activity. There are reports of arrests just off court grounds of persons identified by non-uniformed ICE personnel in courtrooms. In one case there was an arrest by ICE of a woman hiding from them in a courthouse restroom. Courthouses for courts of general jurisdiction are owned and managed by counties. Courthouses for courts of limited jurisdiction are leased from public and private landlords. The NMSC met with state and regional ICE authorities and were told the in-court activity is the same as before; non-uniformed personnel observe and look for ICE targets but any arrests occur off of courthouse grounds. However, a policy change means persons incidentally identified as of interest to federal authorities relating to immigration status will now be taken into custody. The previous administration only took into custody targets involved in serious criminal activity and not those incidentally identified as [b]y mere presence at a crime scene or involvement as victims or witnesses or when stopped for minor traffic violations. ***New Mexico judges report being told that victims and witnesses are intimidated by the new approach and express concern that this will spread and interfere with willingness to report or testify about civil and criminal conduct.*** Community organizations have also written to the NMSC to express similar concerns about "stepped up activity in state courthouses" by ICE.

(Emphasis added).

85.     On April 10, 2019, ICE agents arrested a suspect <u>inside</u> a courtroom within the

Santa Fe County Magistrate Courthouse.

86.     Based on Plaintiffs' own observations and incident reports filed with the New

Mexico state trial courts and reported to the New Mexico Supreme Court, since 2017, ICE has

employed a practice of arresting litigants coming to and from New Mexico State courts.

87.     This includes arrests in and around the courthouse, including courthouse restrooms,

parking lots, and front steps.

88.     As a result, many noncitizen New Mexico residents will not attend New Mexico State courts for fear of civil arrest and detention, which impedes the fair and equal administration of justice within New Mexico State courts.

89.     This action only concerns civil arrests upon litigants who are not already under state criminal custody. Arrests of those brought into court while in state criminal custody do not raise the same concerns as arrests of those who come to court under their own power for an entirely separate legal matter.

90.     Plaintiffs are not challenging ICE's authority to arrest individuals brought into court while in state criminal custody.

91.     The following are characteristics of ICE's civil courthouse arrests when enforcing the Courthouse Arrest Policy throughout the country:

   a.     ICE agents are in plain clothes but are readily identifiable by those who frequent the courts.

   b.     ICE officers often appear to have a target in mind when they arrive in court, however, they sometimes question and arrest others in court who the ICE officers believe may have committed civil immigration infractions. This can include family members who are accompanying someone ICE has targeted for arrest. ICE often reviews court dockets upon arriving in court, and sometimes arrests or attempts to arrest others who happen to appear in court that day, and who ICE believes may have committed a civil immigration infraction.

   c.     ICE's arrests and attempted arrests are disruptive and may even involve violence. These incidents often occur in public areas of the court. Given the

physical nature of some of these incidents, ICE arrests can require intervention of State court staff.

d.    ICE agents, who are typically in plain clothes, frequently fail to show their badges or show any documentation while making arrests, which has at times led members of the public to believe that ICE agents are kidnapping their targets—without the person being arrested having any idea who is arresting him or her.

e.    ICE arrests often interfere with ongoing State court proceedings. When criminal defendants are arrested and detained by ICE while their criminal cases are still pending, the defendants often are unable to return to State court to resolve their criminal cases, which presents obstacles to both the prosecution of the State case as well as the individual's right to a fair trial.

92.    ICE's civil Courthouse Arrest Policy along with the myriad courthouse arrests that have taken place in New Mexico over the past three years have caused a chilling effect that has reverberated throughout the state, causing people to fear going to court because they believe doing so exposes them to civil ICE arrest.

**IV.    Because of ICE's Courthouse Arrest Policy, many noncitizen New Mexico residents will not attend New Mexico State courts for fear of civil arrest and detention, causing significant harm to the Plaintiffs in this matter.**

93.    The impact of ICE's civil-courthouse-arrest policy has made clear that the concerns that underlie the privilege against civil arrest of those attending court on official business are well founded.

94.    Civil plaintiffs, criminal defendants, prosecutors, defense attorneys, and organizations dedicated to civil legal advocacy for immigrants all suffer the negative effects of the

chill on immigrant communities' willingness to engage with courts—a direct result of ICE's policy.

95.     As the key players on the prosecution and defense sides of the criminal justice system, Plaintiffs First Judicial District Attorney's Office and LOPD have joined together to challenge what they collectively agree to be a profound threat to the New Mexico criminal justice system.

96.     Both prosecutors and criminal defense attorneys depend on witnesses to carry out investigations, prosecutions, and criminal defense.

### A.     Harms to Plaintiffs Office of the Attorney General for the State of New Mexico, First Judicial District Attorney's Office and LOPD

97.     ICE's Courthouse Arrest Policy is undermining the work of Plaintiffs Office of the Attorney General for the State of New Mexico, First Judicial District Attorney's Office, and LOPD by preventing many victims and witnesses (including criminal defendants) from appearing in court.

98.     The Courthouse Arrest Policy also makes it more difficult to obtain criminal defendants' appearances in court for a criminal case/trial because defendants are either arrested, detained, and/or subjected to removal proceedings prior to resolution of their criminal cases.

99.     In some cases, the Courthouse Arrest Policy makes prosecutions by Plaintiffs Office of the Attorney General for the State of New Mexico and First Judicial District Attorney's Office impossible.

100.     Similarly, the Courthouse Arrest Policy sometimes makes criminal defense by LOPD impossible.

101.     The Courthouse Arrest Policy also forces the Plaintiffs Office of the Attorney General for the State of New Mexico, First Judicial District Attorney's Office, and LOPD to spend

significant time and resources preparing for hearings and trials that do not occur because either the defendant and/or key witnesses do not appear due to fear of, or actual, ICE arrest.

102.    The effects of the Courthouse Arrest Policy suffered by Plaintiffs Office of the Attorney General for the State of New Mexico, First Judicial District Attorney's Office, and LOPD frustrate the missions of their respective offices and impede the State of New Mexico's administration of justice.

103.    The criminal justice system cannot function if the key players in that system— victims, witnesses, and criminal defendants—are not willing and able to appear in court.

**B.      Harms to Plaintiff Faith Coalition**

104.    Plaintiff Faith Coalition has suffered a concrete and demonstrable injury to its activities because the Courthouse Arrest Policy has drained its resources by forcing the organization to redirect funding and alter its mission.

105.    Prior to 2017, Plaintiff Faith Coalition's mission was to collaborate with faith communities in pursuit of immigrant justice through a variety of direct services, including providing rides to medical appointments or to food banks, providing sermons at faith gatherings, providing short-term assistance to clients released from immigration detention, and providing educational opportunities for the faith community on issues affecting the immigrant community.

106.    In 2017, when ICE began targeting state courthouses as sites for civil immigration enforcement, Plaintiff Faith Coalition began learning from clients that they were refusing to go to court on civil matters out of fear of being arrested by ICE.

107.    Accordingly, in March 2017, Plaintiff Faith Coalition diverted its time and resources to providing court companionship to noncitizen clients who may be at-risk of ICE's civil

arrest policies, and also documenting ICE's behavior in and near state courthouses throughout the Bernalillo, Cibola, and Valencia Counties in the State of New Mexico.

108.    Since 2017, as a result of ICE targeting state courthouses as sites for civil immigration enforcement, Plaintiff Faith Coalition for Immigrant Justice has diverted its resources to engage in significantly more court companionship efforts, which has drained funding and cut the available resources required to perform nearly all of the direct services that it previously provided.

### C.    Harms to Plaintiff Enlace Comunitario

109.    Prior to 2017, Plaintiff Enlace Comunitario's mission had been to assist clients, including noncitizens, in securing Domestic Violence Orders of Protection.

110.    This mission has been frustrated because many of its clients who are victims of domestic violence and who would qualify for an Order of Protection are now not willing to seek such an Order because it requires going to court, where victims fear ICE arrest of themselves and their family members.

111.    Prior to 2017, Plaintiff Enlace Comunitario devoted a significant amount of time to client intakes to assess the facts and merits of domestic violence matters and to attend court proceedings.

112.    As state courthouse arrests escalated, Plaintiff Enlace Comunitario's clients began cancelling meetings with staff as they became increasingly fearful of the court process, harming Plaintiff Enlace Comunitario, as funders will not reimburse the organization for a meeting that did not take place.

113.    By Spring of 2017, Plaintiff Enlace Comunitario had to divert its resources from advising clients on domestic violence related counsel to advising clients about ICE courthouse

arrests, preparing and filing motions for telephonic appearances for their clients, meeting with clients for significantly longer amounts of time in order to discuss immigration rights and consequences of raising domestic violence related claims, and physically accompanying pro se clients to court, all due to ICE's presence in state courthouses.

114.    Such changes have drained Plaintiff Enlace Comunitario's funding and cut the available resources required to perform its mission.

### D.    Harms to Plaintiff EL CENTRO and its Members

115.    Plaintiff EL CENTRO has also suffered an injury as a result of ICE's Courthouse Arrest Policy.

116.    Due to the drastic uptick in arrests in and around courthouses in Albuquerque, Plaintiff EL CENTRO has had to divert funds and dedicate staff time to addressing these arrests instead of engaging community organizing to advance immigrant rights.

117.    Plaintiff EL CENTRO's staff regularly fields calls from community members who are fearful of appearing in court because of their immigration status or that of their family members.

118.    When such calls are received, Plaintiff EL CENTRO's staff must research the status of their case and then will refer them to partner organizations that will provide court accompaniment to the individual.

119.    Due to the increase in courthouse arrests, Plaintiff EL CENTRO has had to develop and modify new "know-your-rights" materials and presentations and has had to create a "rapid response" model to assist families whose family members have been arrested at court by ICE.

120.    Additionally, Plaintiff EL CENTRO's members themselves have been injured and continue to be injured by the ongoing ICE courthouse arrests.

121.    Plaintiff EL CENTRO has over 5,000 members, the majority of whom reside in Albuquerque and are low-wage immigrant workers from mixed status families.

122.    Courthouse arrests have had a chilling effect on their willingness to show up to court as defendants (often for minor infractions such as routine traffic violations), to seek civil Protective Orders, to participate in court settings as witnesses and to accompany family members (including minors) to court.

123.    The consequences of this chilling effect are missed court dates that lead to criminal warrants, individuals who forgo Protective Orders against abusive partners and witnesses to civil litigation who refuse to appear to testify, all of which create impediments to our justice system.

124.    Ensuring that their members have equitable access to New Mexico's State court system is germane to Plaintiff EL CENTRO'S mission of protecting the rights of New Mexico's immigrant community.

125.    All of the named Plaintiffs' experiences make clear that the targets of ICE's civil arrest policy no longer view New Mexico State courthouses as places they can safely visit.

126.    ICE's Courthouse Arrest Policy erodes the immigrant community's trust in the civil and criminal justice system and deepens their distrust of those law enforcement officers who stand at the vanguard for collecting the evidence necessary to prosecute civil and criminal cases.

127.    The erosion of this trust caused by civil arrests pursuant to the Courthouse Arrest Policy has a significant chilling effect on public safety throughout New Mexico.

## CAUSES OF ACTION

### COUNT I
### ICE's Courthouse Arrest Policy Exceeds Statutory Authority in Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(C)

128.     Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

129.     The Administrative Procedure Act instructs courts to "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations...." 5 U.S.C. § 706(2)(C).

130.     Accordingly, defendants may only exercise authority conferred by statute. *City of Arlington v. FCC*, 569 U.S. 290, 297-98 (2013).

131.     There exists a longstanding common-law privilege against civil arrest of witnesses, parties, and others attending court on official business recognized by both federal and state courts.

132.     ICE arrests based on alleged civil immigration infractions are considered civil in nature.

133.     Congress' general grant of power to ICE to conduct civil arrests did not abrogate the well-settled common law privilege that prohibits civil arrests of parties, witnesses and others attending court on official business.

134.     ICE's Courthouse Arrest Policy authorizing civil arrests of people in, or traveling to or from, courthouses, and ICE's practice of carrying out civil arrests against individuals attending New Mexico courts on official business, thus exceed ICE's statutory authority.

135.     The Courthouse Arrest Policy is therefore "in excess of statutory jurisdiction, authority, or limitations," in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(C).

136.     Defendants' violation causes ongoing harm to Plaintiffs, their clients, and their members.

## COUNT II
**ICE's Courthouse Arrest Policy is Contrary to the Federal and New Mexico State Common Law Privilege Against Civil Arrests within or near Courthouses in Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(B)**

137.     Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

138.     The Administrative Procedure Act instructs courts to "hold unlawful and set aside agency action" that is "contrary to … privilege[.]" 5 U.S.C. § 706(2)(B).

139.     ICE's arrests based on alleged civil immigration infractions are civil in nature.

140.     There exists a longstanding common-law privilege against civil arrest of witnesses, parties, and others attending court on official business recognized by both federal and state courts.

141.     ICE's Civil Courthouse Arrest Policy violates the common law privilege against civil courthouse arrests and thus violates the Administrative Procedures Act, 5 U.S.C. § 706(2)(B).

142.     Defendants' violation causes ongoing harm to Plaintiffs, their clients, and their members.

## COUNT III
**ICE's Courthouse Arrest Policy is Arbitrary, Capricious, an Abuse of Discretion, or Otherwise Not in Accordance with Law in Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**

143.     Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

144.     The Administrative Procedure Act instructs courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

145. ICE's Courthouse Arrest Policy was adopted by Defendants without a full consideration of the foreseeable harms of their policy, without an adequate explanation of their prioritizing civil arrests in or around courthouses over those harms, and without an adequate justification of the change from Defendants' prior policies on courthouse arrests.

146. The Courthouse Arrest Policy is therefore "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

147. Defendants' violation causes ongoing harm to Plaintiffs, their clients, and their members.

### COUNT IV
### ICE's Courthouse Arrest Policy Exceeds the Federal Government's Powers Under the Tenth Amendment to the United States Constitution

148. Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

149. The Tenth Amendment to the United States Constitution provides, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

150. The Tenth Amendment preserves the states' historic, sovereign, and fundamental autonomy to control the operation of their jurisdictions and to pursue criminal prosecutions.

151. The administration of criminal and civil justice is a core sovereign power reserved to the states.

152. The Courthouse Arrest Policy commandeers New Mexico's judicial system for purposes of carrying out the federal government's civil immigration policy and unduly interferes

with New Mexico's core sovereign judicial and police functions in violation of the Tenth Amendment.

153.    The Courthouse Arrest Policy exceeds the federal government's powers under the Tenth Amendment to the United States Constitution.

## COUNT V
## ICE's Courthouse Arrest Policy Violates the Right of Access to the Courts

154.    Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

155.    Defendants' actions deprive Plaintiffs of meaningful access to New Mexico State courts in violation of Plaintiffs' rights under the First (right to petition the Government for redress of grievances), Sixth (rights of criminal defendants), Seventh (right to a jury in civil cases), and Fourteenth Amendments (equal protection) to the United States Constitution.

156.    Policies that ban access outright and policies that obstruct the right of access to Courts in more subtle ways are prohibited.

157.    Forcing noncitizens to choose between exercising their right of access to courts or risk being subjected to a civil arrest at a New Mexico courthouse creates an impermissible frustration to the right of access to courts, as protected by the First, Sixth, Seventh, and Fourteenth Amendments to the United States Constitution.

158.    Forcing noncitizens accused of crimes to choose between exercising their right to stand trial or risk being subjected to a civil arrest at a New Mexico courthouse creates an impermissible frustration to the right of access to courts, as protected by the First, Sixth, and Fourteenth Amendments to the United States Constitution.

159.    Forcing noncitizen victims of crime to choose between exercising their right to litigate civil controversies under New Mexico law or risk being subjected to a civil arrest at a New

Mexico courthouse creates an impermissible frustration to the right of access to courts, as protected by the First, Seventh, and Fourteenth Amendments to the United States Constitution, the New Mexico Constitution, and the New Mexico Victims of Crimes Bill of Rights.

160.    ICE's Courthouse Arrest Policy impermissibly creates a class of persons who are unequally treated for exercising their right of access to courts in violation of the Fourteenth Amendment to the United States Constitution.

161.    The Courthouse Arrest Policy violates the First, Sixth, Seventh, and Fourteenth Amendments to the United States Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Issue an Order holding unlawful, vacating, and setting aside ICE's Courthouse Arrest Policy.

B.    Declare ICE's Courthouse Arrest Policy in excess of Defendants' statutory jurisdiction, authority, or limitations in violation of 5 U.S.C. § 706(2)(C).

C.    Declare that ICE's Courthouse Arrest Policy is contrary to the federal and New Mexico State common law privilege against civil arrests within or near courthouses, in violation of 5 U.S.C. § 706(2)(B).

D.    Declare that ICE's Courthouse Arrest Policy is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

E.    Declare that ICE's Courthouse Arrest Policy interferes with New Mexico's core sovereign functions and violates the Tenth Amendment to the United States Constitution.

F.    Declare that ICE's Courthouse Arrest Policy violates the First, Sixth, Seventh, and Fourteenth Amendments to the United States Constitution.

G.    Enjoin Defendants and all of their officers, employees, agents, and anyone acting in concert with them, from implementing, applying, or taking any action whatsoever under the Courthouse Arrest Policy, and from civilly arresting parties, witnesses, and others attending New Mexico courthouses on official business while they are going to, attending, or leaving the courthouse.

H.   Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees pursuant to 42 U.S.C. § 1988.

I.   Grant such other relief as the Court deems just and proper.

Respectfully submitted,

**MARTINEZ, HART,**
**THOMPSON & SANCHEZ, P.C.**

*/s/ Julio C. Romero*
Julio C. Romero
Bruce E. Thompson
1801 Rio Grande Blvd. NW, Ste. A
Albuquerque, NM 87104
(505) 343-1776
(505) 344-7709 facsimile
julior@osolawfirm.com
brucet@osolawfirm.com

**AMERICAN CIVIL LIBERTIES**
**UNION OF NEW MEXICO**

*/s/ María Martínez Sánchez*
María Martínez Sánchez
Leon Howard
1401 Coal Ave. SW
Albuquerque, NM 87104
(505) 266-5915
(505) 266-5916 facsimile
msanchez@aclu-nm.org
lhoward@aclue-nm.org

**FREEDMAN, BOYD, HOLLANDER,**
**GOLDBERG, URIAS & WARD, P.A.**

*/s/ David H. Urias*
David H. Urias
Larissa M. Lozano
20 First Plaza
Suite 700
Albuquerque, NM 87102
(505) 842-9960
(505) 842-0761 facsimile
dhu@fbdlaw.com
lml@fbdlaw.com

*Attorneys for Plaintiffs*

29